(45 Misc. Rep. 184)

### In re CITY OF NEW YORK.

(Supreme Court, Special Term, New York County. November, 1904.)

1. CONSTITUTIONAL LAW—SPECIAL ACT—LAYING RAILROAD TRACKS.

   Laws 1901, p. 1765, c. 712, authorizing the reconstruction of the Manhattan terminal of the Brooklyn Bridge, and conferring power to lay down railroad tracks, is not a violation of Const. art. 3, § 18, prohibiting the Legislature from passing a local act granting any corporation the right to lay down railroad tracks, as such power is not conferred on a private corporation, but on the city, to which such constitutional provision is inapplicable.

2. MUNICIPAL CORPORATIONS — BROOKLYN BRIDGE TERMINAL — CONSENT OF PROPERTY OWNERS—RAILROAD TRACKS.

   Laws 1901, p. 1765, c. 712, confers on the commissioner of bridges authority, with the board of estimate and apportionment, to select such real estate as is necessary for the reconstruction of the terminal of the Brooklyn Bridge, by deed or by condemnation, and that no street railroad shall be constructed by virtue of the act without the consent of the local authorities and the consent of the owners of one-half the value of the property bounded on the portion of the street to be used. *Held*, that where

the object of the proceeding is to acquire land for general terminal purposes, and the plan submitted showed that the tracks, as projected, cut the streets in such a way within the limits of the tract proposed to be obtained that there would be no property left bounded on the portion of the street in which it is intended to lay the tracks, such consent of the property owners need not be obtained.

**3. SAME—PREPARATION OF PLANS.**

There is no provision in Laws 1901, p. 1765, c. 712, relating to the Manhattan terminal of the Brooklyn Bridge, requiring the preparation of plans, as well as specifications, as a prerequisite to the institution of condemnation proceedings.

**4. SAME—CONDEMNATION OF LAND.**

Greater New York Charter (Laws 1901, p. 609, c. 466) § 1436, providing for condemnation of real estate if no agreement with the owners thereof is reached, implies only the absence of agreement, and an attempt to acquire the property by purchase is unnecessary.

**5. SAME—LEASE BY CITY.**

An act of the city, in its private capacity as a landowner, in leasing certain property with provisions for renewals, cannot affect the city in its public capacity, and prevent it from acquiring lands, where the necessities of the public demand it.

In the matter of the application of the city of New York to require title to certain real estate for the reconstruction of the Manhattan terminal of the New York and Brooklyn Bridge. Motion by petitioner for appointment of commissioners, and by respondents to sever the proceedings against those who oppose the appraisement. Motion appointing commissioners granted. Motion to sever denied.

John J. Delany, Corp. Counsel (Theodore Connoly, Charles D. Olendorf, and Charles N. Harris, of counsel), for the motion.

Lewis L. Delafield, Lewis M. Johnson, Edward W. S. Johnston, Holm & Smith, David Keane, and William J. Underwood, opposed.

Straley & Hasbrouck, Blandy, Mooney & Shipman, and Mulqueen & Mulqueen (John A. Straley and Charles Blandy, of counsel), for certain property owners and for the motion.

Feitner & Beck, Philbin, Beekman & Menken, Nash & Jones, and De Witt, Lockman & De Witt, for certain property owners.

GIEGERICH, J. The petitioner seeks to obtain the appointment of commissioners of estimate and appraisal in proceedings to acquire certain real estate for the purpose of reconstructing or extending the Manhattan terminal of the Brooklyn Bridge. Answers have been interposed on behalf of various owners of property sought to be acquired, and the issues raised by such answers have been tried, and the matter now is presented for decision upon the petition and answers, and upon the record of such trial. The proceeding is brought under chapter 712, p. 1765, of the Laws of 1901, sometimes designated as the "McCarren Act," which authorizes and provides for the reconstruction or enlargement of the Manhattan terminal of the Brooklyn Bridge.

Numerous objections are raised on behalf of different property owners, the first of which is that the act is unconstitutional, in that, being a local act, it nevertheless authorizes corporations, with the consent of the commissioner of bridges, to lay down railroad tracks, in violation of section 18 of article 3 of the state Constitution, which prescribes

that "the Legislature shall not pass a private or local bill in any of the following cases:  *  *  *  Granting to any corporation, association or individual the right to lay down railroad tracks," and also that:

"The Legislature shall pass general laws providing for the cases enumerated in this section, and for all other cases which in its judgment may be provided for by general laws.  But no law shall authorize the construction or operation of a street railroad except upon the condition that the consent of the owners of one-half in value of the property bounded on, and the consent also of the local authorities having the control of, that portion of a street or highway upon which it is proposed to construct or operate such railroad be first obtained, or in case the consent of such property owners cannot be obtained, the Appellate Division of the Supreme Court, in the department in which it is proposed to be constructed, may, upon application, appoint three commissioners who shall determine, after a hearing of all parties interested, whether such railroad ought to be constructed or operated, and their determination, confirmed by the court, may be taken in lieu of the consent of the property owners."

So far as this objection is based upon the fact that the act is local, as distinguished from general, the decision of the Court of Appeals in Sun Pub. Ass'n v. Mayor, 152 N. Y. 257, 46 N. E. 499, 37 L. R. A. 788, is conclusive against it.  In the case cited, at page 272, 152 N. Y., page 503, 46 N. E., 37 L. R. A. 788, in speaking of this section of the Constitution, the court said:

"We are of the opinion that the corporation, association, or individual here referred to has no application or reference to a municipality, and that a county, city, town, or village is not included within its provisions."

That the permission to lay down railroad tracks, so far as any such permission may be implied in the provision for extending the terminal, is a permission given to the city, and not to the railroad corporations, is apparent from the provision of section 3 of the act, which vests in the city ownership of all structures and construction work of every nature erected or constructed under or in pursuance of the act, which same provision is repeated in section 6 of the act, where it is declared that:

"If any part of such extension of such terminal, in accordance with such plans and specifications and upon the location so approved and adopted and authorized to be constructed and operated under and by virtue of this act, shall be a street railroad, then such portion of such extension constituting such a street railroad shall be the property of the city and a part of the New York and Brooklyn Bridge."

It is plain, therefore, that the present case is one of a grant to a municipal and not a private corporation, and consequently not within the intent of the portion of section 18, first above quoted, as construed by the Court of Appeals in the case last cited.  It does not follow, however, that the fact that such permission is given to a municipal rather than a private corporation exempts the case from the last-quoted portion of section 18, relating to the consent of the local authorities and property owners, or, in the alternative, of the Appellate Division.  It is not necessary to pass upon that question, however, because the statute itself imposes, in paragraph 6, substantially the same conditions concerning such consents as are found in the Constitution; the language of the statute being practically a quotation of the language of the Constitution on this point.  The first question is, consequently, not whether

such consents must ultimately be obtained before the actual laying down and operation of any tracks in the proposed terminal, but whether it is necessary to obtain such consents at this stage of the undertaking. To determine this point it is necessary to examine the act in its entirety, and such examination satisfies me that the city authorities are right in their construction of the statute, and that the authority to deal with street railroads which may use the bridge is a power entirely independent of the power to reconstruct the terminal, and select and acquire such real estate as may be necessary for such reconstruction. The first section of the act authorizes the commissioner of bridges to prepare, and, with the approval of the board of estimate and apportionment, to adopt, plans and specifications for the reconstruction of the bridge terminal, or for the construction of an extension thereof, or for both such construction and reconstruction. The section then further provides that:

"The said commissioner is also authorized, with the approval of said board of estimate and apportionment by a majority vote thereof, to select and specify such real estate, tenements, hereditaments, corporeal or incorporeal rights in the same as such commissioner with such approval of said board shall determine to be necessary for such construction or reconstruction purposes, which are hereby declared to be public uses and purposes, and the city of New York is hereby authorized to acquire title thereto by condemnation."

Then section 4 of the act confers authority to acquire title by deed or voluntary grant or by condemnation to any and all real estate, tenements, hereditaments, or corporeal or incorporeal rights in the same which shall have been so selected and determined to be necessary. Later, and in section 6 of the act, it is prescribed that:

"No street railroad shall be constructed or operated under and by virtue of this act unless the consent of the local authorities having the control of that portion of a street or highway upon which it is proposed to construct or operate such railroad be first obtained, and unless there be also obtained the consent of the owners of one-half in value of the property bounded on such portion of such street or highway, or unless in case the consent of such property owners cannot be obtained, the Appellate Division of the Supreme Court in the First Judicial Department shall upon application appoint three commissioners to determine whether such railroad ought to be constructed and operated, and they shall determine, after a hearing of all parties interested, that such railroad ought to be constructed and operated, and their determination shall be confirmed by the court, which determination shall be taken in lieu of the consent of the property owners."

The case here presented differs materially, therefore, from cases like those cited on behalf of the objecting owners, where private transportation corporations have sought to acquire property by condemnation proceedings for the sole purposes of such transportation, without having first obtained the consents required by the Constitution, or by the various statutes under which the proceedings were instituted. Here a municipal corporation is seeking property needed for general terminal purposes, with authority to lay down railroad tracks within such terminal, if and as such course may be finally determined upon. The present proposition is, however, simply for the acquisition of the land for general terminal purposes, and the question of construction and operation of tracks, and of consents thereto, will come up in due time and order. The decision of the Court of Appeals in Matter of

Rochester Elec. R. Co., 123 N. Y. 351, 25 N. E. 381, relied upon most strongly in support of the objection now being discussed, was decided upon language broadly different from that contained in the act under consideration. There the condition of obtaining consents was expressly annexed by the terms of the statute not only to the actual construction and operation of the road, but also to the acquiring of title. But assuming, in view of the fact, as shown by the plans submitted, that it is intended in the end to lay railroad tracks over certain portions of the space sought to be acquired, and that the provision for the consents of property owners becomes operative at this stage of the proceeding, then an examination of the plans shows the tracks, as now projected, cut the streets at right angles, and in such a way, within the limits of the entire tract proposed to be obtained, that there will be left remaining no property bounded upon the portions of the streets upon or over which it is, according to the present plans, intended to lay tracks.

Coming next to the objection that this proceeding cannot be maintained because of the failure to prepare specifications as well as plans of the proposed terminal, it should be observed that the present act differs distinctly in its terms from many similar acts in which the power of the city to proceed under such statutes has been expressly withheld until the plans and specifications have been made and approved; such being the case in chapter 413, p. 861, of the Laws of 1892, authorizing a drawbridge over the Harlem river; chapter 147, p. 286, of the Laws of 1894, also authorizing a bridge over that river, and chapter 617, p. 740, of the Laws of 1896, authorizing a bridge over the Bronx river, at Westchester avenue—the enactment in each of those cases specifically stating that "nothing shall be done under this act until the plans and specifications    *    *    *    shall have been submitted    *    *    *    and approved." In the present case, however, there is no such language, nor equivalent language. There are, first, provisions for the preparation of plans and specifications by the commissioner of bridges, and then the statute proceeds:

> "The said commissioner is also authorized, with the approval of said board of estimate by a majority vote thereof, to select and specify such real estate, tenements, hereditaments, corporeal or incorporeal rights in the same as such commissioner with such approval of said board shall determine to be necessary for such construction or reconstruction purposes, which are hereby declared to be public uses and purposes, and the city of New York is hereby authorized to acquire title thereto by condemnation."

There is consequently no express requirement in the statute that specifications shall be approved or prepared before the proceedings to condemn are begun, nor is there any apparent need for such specifications, such as there would be if any corporeal or incorporeal rights in the lands of the objecting owners were taken, as distinguished from the entire interest, either fee or leasehold, which they possess; the fact being that the entire interest of each protesting property owner will be taken for the proposed improvement. Were it otherwise it might be important that detailed specifications should be prepared in advance, in order that the owners of the property taken by the project might know to just what extent their property would be damaged. In the absence, therefore, both of any requirement for speci-

fications in the language of the statute, as well as of any need for such specifications, I do not think such a meaning should be read into the act.

Another objection urged is that it is not shown that there has been any attempt to acquire the property by purchase, as provided by section 1436 of the Greater New York charter (Laws 1901, p. 609, c. 466). Even if the provisions of that section were applicable to the present case, there is no requirement contained therein that an attempt shall be made to reach such agreement, but a mere conferring of power and authority to make such an agreement, followed by this language:

"If no such agreement is reached, or if any such agreement does not include the whole of the lands and interest therein, said board shall direct the corporation counsel to institute proceedings for the condemnation of such lands and interests," etc.

The principle applicable to the situation is stated by Lewis, in his treatise on the Law of Eminent Domain, as follows:

"The matter of requiring an attempt to agree rests merely in the discretion of the Legislature, and a statute is not invalid because it does not require it. Of course, if the statute does not require an attempt to agree, none is necessary, and inability to agree need not be alleged or shown." 2 Lewis, Em. Dom. 744.

The cases relied upon in the various briefs in which this point is discussed were decided upon statutes quite different in phraseology from that now under consideration. In Dyckman v. Mayor, 5 N. Y. 434, for instance, the words of the statute (Laws 1834, p. 453, c. 256, § 13) are, "In cases of disagreement between the commissioners and the owners of any property," which was for manifest reason held to mean that there must be an attempt made to reach an agreement, and that the failure to agree was a fact necessary to be alleged and proved. Similarly, in Metropolitan El. R. Co. v. Dominick, 55 Hun, 198, 203, 8 N. Y. Supp. 151, it was said:

"By section 13 of the act (Laws 1850, p. 215, c. 140) it is provided that the company may apply in case it 'is unable to agree for the purchase' of the required property. But the company cannot say that it is unable to agree with the property owner until it has tried to do so."

Comparing the language under construction in those cases with the words of the present statute, it is obvious that "disagreement" and "inability to agree" imply negotiations and an unsuccessful attempt to agree, while the words "if no such agreement is reached" imply only the absence of agreement, not failure or inability to agree. That this construction of the language of the present charter is correct is further apparent from the fact that section 1436 also provides that the owner of any property selected for public purposes may make a written offer to sell to the city, and, in the event his offer is not accepted at the price named by him, and he is awarded a greater sum by the commissioners of estimate, that he shall be entitled to his taxable costs and disbursements, and, in the discretion of the court, to an additional allowance.

Objection is made, furthermore, that there has been no determination by the commissioner of bridges that it was necessary to take the lands

proposed, but the record does not support this claim; it appearing, on the contrary, that the commissioner had determined such necessity.

Another objection is based upon covenants in certain leases from the city to some of the protesting owners, which provide for future renewals unless the premises, or some part thereof, shall, at the expiration of the various terms of 21 years each, be required for public purposes. The rule is established by numerous decisions that an act of the city in its private capacity as a landowner cannot have the effect of binding the city in its public capacity as an agent and instrumentality of the state, and prevent it from acquiring such lands as the necessities of the public require. Brimmer v. Boston, 102 Mass. 19; Tait's Ex'r v. Central Lunatic Asylum, 84 Va. 271, 4 S. E. 697; Kip v. N. Y. & H. R. R. Co., 67 N. Y. 227. Even had the Legislature attempted by express statute to impose such disability, it is doubtful if it would have the power to do so. See cases cited in 10 Am. & Eng. Ency. of Law (2d Ed.) 1099. It may be, in the present instance, that the aggrieved owners of the leaseholds will have a right against the city to some different measure of damages for the taking of the property from that which they would be entitled to, were there no such covenants in the leases, but they cannot be permitted to stand on those covenants and block the entire project.

My conclusion is that there has been a substantial compliance with all the requirements of the statute up to the present stage of the proceedings, and that the improvement, of which there is such urgent and unquestioned need, should not be delayed by a denial of this motion.

Another motion has been made in the proceeding, on behalf of certain property owners, who are desirous that the proceedings move on rapidly, to sever the issues raised by the protesting owners, in order that their own property may be taken and paid for without delay. It is argued that the pendency of these proceedings constitutes an incubus upon the property, and renders it unmarketable. On the other hand, on behalf of the city, it is pointed out that some of the objections raised are of such a character that, if it should be finally held that they are well taken, it may never be possible to obviate them and acquire the property of those objecting, and, furthermore, that such property cuts through the center of, and divides into two parts, the entire tract proposed to be obtained, and that without it the project would be impracticable and the other portions could not be used for the purposes intended. Under such circumstances, I would not be warranted in granting the motion, even if I had the power. The motion to sever is therefore denied, and the motion for the appointment of commissioners of appraisal is granted.

Ordered accordingly.